Filed 7/29/13  In re A.L. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>            v.<br><br>T.L.,<br><br>        Defendant and Appellant. | G047470<br><br>(Super. Ct. No. DP021790)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Jane Shade, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal; and Leslie A. Barry for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\*          \*          \*

T.L. (Father) appeals from the juvenile court's jurisdictional order finding his daughter, A.L., comes within the provisions of Welfare and Institutions Code section 300, subdivisions (b) and (d), from the dispositional order declaring A.L. to be a dependent child of the juvenile court, and from the custody order granting A.L.'s mother (Mother) sole legal and physical custody of A.L.[1] The juvenile dependency petition alleged that Father sexually abused A.L. on several occasions.

A.L., who was born in 1995, is autistic. It has been reported that she functions at a third grade to sixth grade level, attends special education classes, and "excels at comprehension." A.L. cannot speak. She communicates through an iPad by typing one letter at a time, often with facilitated communication, which is "a process by which a facilitator supports the hand or arm of a communicatively impaired individual while using a keyboard or typing device." (Am. Psychol. Assn., Resolution on Facilitated Communication (Aug. 14, 1994) <http://www.apa.org/divisions/div33/fcpolicy.html> [as of July 29, 2013] (APA Resolution).) By means of typing on an iPad, it was communicated that Father had inappropriately touched A.L.

At the core of this appeal is Father's challenge to the reliability of communications attributed to A.L. using various degrees of facilitated communication. Father contends A.L.'s facilitators—not A.L.—were the source of the allegations of sexual abuse made against him, the juvenile court denied him the means by which to test the reliability of those communications, and A.L., though described as "extremely bright," has never had her intellectual and cognitive level or communication skills tested. In making this challenge to the reliability of the communications of sexual abuse, Father asserts three points of error: (1) the juvenile court erred by denying his motion to have A.L.'s cognitive, verbal, developmental, and communications skills evaluated by his

_____

[1] Code references are to the Welfare and Institutions Code unless noted otherwise.

2

expert; (2) the juvenile court erred by overruling Father's objections to hearsay statements attributed to A.L., contained in the social services agency reports; and (3) the juvenile court erred by finding that A.L. was unavailable as a witness.

We conclude the juvenile court did not err in any of the challenged rulings; on the contrary, the court did a commendable job in making difficult decisions in a sensitive and fair manner. Over the course of a lengthy jurisdictional/dispositional hearing, the juvenile court heard testimony from eight witnesses (including A.L.'s facilitators and therapist), received in evidence eight reports from the Orange County Social Services Agency (SSA), listened to an audio recording of an interview of A.L., during which allegations of sexual abuse were disclosed, and considered evidence on both sides of the debate over the reliability of facilitated communication and on its use by A.L. The court heard extensive testimony that A.L. would suffer substantial trauma and possibly inflict injury on herself if required to testify.

The juvenile court made thorough and intelligent factual findings. Those findings are supported by substantial evidence and are legally sufficient to support the court's rulings. We therefore affirm. In view of the important issues raised by the evidence, and the legal significance of the evidence on the rights of A.L. and Father, we review the evidence in detail.

## FACTS AND PROCEDURAL HISTORY

### I.

### Background: Facilitated Communication

Facilitated communication is "a process by which a facilitator supports the hand or arm of a communicatively impaired individual while using a keyboard or typing device. It has been claimed that this process enables persons with autism or mental

3

retardation to communicate."[2]  (APA Resolution, *supra*, <http://www.apa.org/divisions/ div33/fcpolicy.html> [as of July 29, 2013].)

Facilitated communication has its supporters and its detractors.  Its supporters claim that "[p]ersonal accounts and qualitative descriptions suggest that messages produced using this technique may reveal previously undetected literacy and communication skills in people with autism, and other disabilities."  (Am. Speech-Language-Hearing Assn., Position Statement, Facilitated Communication, *supra*, <http://www.asha.org/docs/html/ps1995-00089.html> [as of July 29, 2013].)  Critics of facilitated communication claim:  "Studies have repeatedly demonstrated that facilitated communication is not a scientifically valid technique for individuals with autism or mental retardation.  In particular, information obtained via facilitated communication should not be used to confirm or deny allegations of abuse or to make diagnostic or treatment decisions."  (APA Resolution, *supra*, <http://www.apa.org/divisions/ div33/fcpolicy.html> [as of July 29, 2013].)  The American Speech-Language-Hearing Association has taken the position that "the scientific validity and reliability of facilitated communication have not been demonstrated to date.  Information obtained through or based on facilitated communication should not form the sole basis for making any diagnostic or treatment decisions."  (Am. Speech-Language-Hearing Assn., Position Statement, Facilitated Communication, *supra*.)  Many studies have been conducted to test the efficacy of facilitated communication and whether facilitated communications were authored by the subject or the facilitator.  The results are complicated and by no means uniform.

---

[2]  Facilitated communication also has been described as "a technique by which a 'facilitator' provides physical and other supports in an attempt to assist a person with a significant communication disability to point to pictures, objects, printed letters and words, or to a keyboard."  (Am. Speech-Language-Hearing Assn., Position Statement, Facilitated Communication (1995) <http://www.asha.org/docs/html/ps1995-00089.html> [as of July 29, 2013].)

In this case, the allegations of sexual abuse were communicated by A.L. typing one letter at a time on an iPad sometimes, but not always, with varying degrees of assistance from facilitators. In challenging the reliability of facilitated communication, Father notes that "[i]n several high profile cases, the parent was eventually acquitted of criminal charges when it was determined that the author of the underlying communications was not the autistic child, but rather, the facilitator, who may even have been acting unconsciously." (Fn. omitted.) Father sums up his position as follows: "While it is *not* [F]ather's position that FC [(facilitated communication)] cannot work for some people, it *is* his position that whether it works for [A.L.] remains a mystery and the only way to find out would be to have her evaluated, a process which the juvenile court refused to allow."

## II.

### A.L.'s Detention and Detention Report

A.L. was taken into protective custody on October 20, 2011. SSA prepared a detention report dated October 25, 2011 (the detention report), substantiating allegations of sexual abuse.

The detention report stated: "On or about October 19, 2011, [A.L.] disclosed numerous ongoing incidents of sexual abuse by her father . . . . The incidents of sexual abuse include, but are not limited to, [F]ather orally copulating the child, having the child orally copulate him, and inserting his penis into the child's vagina. The child could not reveal specific times, dates, or when the abuse started, but was able to relay that the incidents occurred in her bedroom and in the bathroom. The child complained of vaginal pain and a forensic medical examination was conducted."

According to the detention report, A.L. initially disclosed the purported abuse via her iPad on October 14, 2011. On that date, "[A.L.] made gestures for

5

Reporting Party[3] to touch her bare breast. Reporting Party attempted to explain to [A.L.] that it was inappropriate for anyone else to touch her breast and child disclosed at that time that [F]ather has touched her breast."

On October 17, 2011, A.L. became upset at school and began hitting herself. "Reporting Party asked [A.L.] what was bothering her and [A.L.] stated that her vagina hurt and she was ashamed and embarrassed about what [F]ather was doing to her. [A.L.] informed Reporting Party that [F]ather has touched her breast and her vagina. Reporting Party believes that the touching was skin to skin because [A.L.] pulled up her bra when referring to her breast. . . . [A.L.] says that [F]ather occasionally sleeps in her bed, however Reporting Party does not know if there has been vaginal penetration and Reporting Party did not ask [A.L.] specifically why her vagina hurt. . . . [A.L.] also indicated that she has touched [F]ather's penis and 'dad feels hard.' Reporting Party did not know if the touching of [F]ather's penis was skin to skin. [¶] [A.L.] says that [M]other is aware of the sexual abuse and she and [F]ather were arguing about the abuse this past weekend. [A.L.] feels that [M]other believes her when she has disclosed the abuse and that [M]other tries to help, but cannot."

According to the detention report, on October 18, 2011, Cecilia B. was interviewed at school by senior social worker C.J. Wilkerson, and Cecilia B. told her: "[I]n the last few weeks, [A.L.] has been exhibiting acting out behaviors that were atypical for her. . . . [O]n Friday[, October 14], [A.L.]'s breast had fallen out of her bra, so [Cecilia B.] put it back in. A short time later [A.L.]'s breast had fallen out again so [Cecilia B.] put it back in. [A.L.] then took [Cecilia B.]'s hand and tried to put it on [A.L.]'s breasts. [Cecilia B.] told [A.L.] that this sort of touching was inappropriate. [Cecilia B.] asked [A.L.] if anyone had touched her breasts before and [A.L.] said yes, her father. [Cecilia B.] asked [A.L.] if she touched the father and [A.L.] said yes.

---

[3] Later identified as A.L.'s aide, Cecilia B.

6

[Cecilia B.] asked [A.L.] how it felt, thinking that [A.L.] might be talking about something other than his penis, but [A.L.] replied 'hard.' [Cecilia B.] did not ask [A.L.] further questions at that time. [¶] On Monday, [October 17], [A.L.] told [Cecilia B.] that her vagina hurt. [Cecilia B.] asked [A.L.] if it was about what they had talked about earlier and [A.L.] said yes. [Cecilia B.] did not question [A.L.] further as she did not want to lead [A.L.] and wanted to consult with her supervisor on what to do next. [Cecilia B.]'s supervisor, Gina Prado, spoke with [A.L.] alone and [A.L.] reportedly disclosed that [F]ather had touched her privates."

The detention report stated that Wilkerson interviewed A.L. on October 18, 2011. Cecilia B. was present during the interview to facilitate communication with A.L., who was using an iPad. Later during the interview, Cecilia B. was relieved by Santiaga Agranowitz, a special education teacher at A.L.'s school. During the interview, which lasted several hours, A.L. typed with one finger, one letter at a time. The detention report stated that A.L. "exhibited vocal ticks with head and hand flipping which also slowed the pace of the interview" and that A.L. "had several, what looked like, self-inflicted bruised bite marks on both hands on the palm between the index finger and the thumb." Cecilia B. and Mother confirmed that A.L. had a history of biting herself.

Wilkerson asked A.L. questions about the allegations of sexual abuse by using anatomical drawings. A.L. was visibly nervous, and her vocal ticks and hand flapping escalated. When A.L. said she was embarrassed, Wilkerson told her that talking about such things can sometimes be embarrassing, but that nothing she said would embarrass Wilkerson. A.L. typed, "you nice," and became more relaxed. Wilkerson then pointed to each private part on the drawing of a girl and asked A.L. if anyone had touched her on those parts. When Wilkerson pointed to the breasts and the vagina, A.L. said, "yes, dad." Wilkerson then pointed to the private parts on an anatomical drawing of a boy and asked A.L. if she had touched anyone on those parts. A.L. said, "[y]es. Dad." Wilkerson asked where this occurred, and A.L. replied, "[i]n restroom." Wilkerson asked

7

what she and Father were doing, and A.L. replied that Father helped her in the shower. A.L. added, "[a]dults do this. You know what I am going respond? He is an adult and I am his daughter. He not nice. He touches." When Wilkerson asked A.L. to relate exactly what happened, A.L. replied, "[h]e put lip. No I don't want him to get angry."

At this point, Agranowitz replaced Cecilia B. Agranowitz supported A.L. by holding her shirt at the shoulder and encouraged her to type by saying, "[f]inish your thought." According to the detention report, "[t]here was no coaching in [A.L.]'s responses."

After a break, the interview resumed. The detention report stated: "Wilkerson asked [A.L.] if she remembered what they were talking about before the break. [A.L.] stated, 'I just want to stop. He kids me about feel his penis but not fun.' . . . Wilkerson asked [A.L.] again if she in fact touched [F]ather's penis and [she] replied, '[y]es, ok. I am his daughter, not his mistress.'. . . Wilkerson asked if [M]other knew about the touching and [A.L.] replied '[n]o. I don't think. He is good at hiding it. I just go embarrassed. I really love my parents.'. . . Wilkerson asked [A.L.] if she touched [Father's] penis on accident or on purpose and [A.L.] replied, 'I did not do it on accident. He undress. I mound (the child was unable to explain the meaning of this word) you mean. Ok. Kiss in the mouth n (and) on penis.'. . . Wilkerson explained that she wanted to get it right and asked [A.L.] if she kissed her father on his penis. [A.L.] replied, '[y]es. Embarrassed.'"

In response to other questions asked by Wilkerson, A.L. said, "[i]t was his idea," she had done so "[m]any times," they were both "[r]eally naked," Mother was "not in house," Father touched her vagina with "lips" and with "[h]is penis," Father "had plastic glove," and Father "put penis inside my vagina." A.L. said that when she kissed Father's penis, there was "[b]ad taste." Wilkerson later asked A.L. if everything she had disclosed was true, to which A.L. replied, "[y]ou don't believe me? Hope you believe me." When asked what she thought should happen to Father, A.L. replied, "[g]o to jail."

8

According to the detention report, later on October 18, A.L. underwent a forensic medical examination at Anaheim Memorial Regional Medical Center. She did exceptionally well and completed the exam without incident.

Wilkerson also interviewed Mother on October 18, 2011. Mother said, "of course," she believed her daughter, but she did not believe Father was capable of sexually abusing A.L. Mother told Wilkerson she is very close with A.L. and that if anything was happening, A.L. would have told her.

Wilkerson interviewed Father by telephone on October 20, 2011. He denied touching A.L. or physically abusing her, did not know the source of her ideas, and stated A.L. has a vivid imagination. Two days earlier, Father had spoken with three investigators from the Orange County Sheriff's Department. Father admitted to them he showered with A.L. about two to three times a week and had done so for "as long as he can remember." Father said that he and A.L. practice the "hand over hand method" to wash A.L., i.e., he puts soap or a washcloth in A.L.'s hand, then places his hand over her hand to assist her in washing. Father stated that sometimes he is naked and sometimes he wears shorts when he showers with A.L., and, on occasion, stands outside of the shower while helping her wash. Mother also helps A.L. wash in the same way. Father was adamant that he does not touch A.L. in a sexual manner. He acknowledged that showering with A.L. may be inappropriate, but insisted that it was not sexual. He showed the investigators the shower where he usually showers with A.L. The investigators noticed the shower appeared to be extremely small, and one investigator observed, "if he and I got into the shower, there would be no way our bodies would not touch or graze one another."

At a team decisionmaking meeting in October 2011, Mother and Father reported that A.L., though unable to speak, "is very smart and is able to communicate non-verbally with them."

9

## III.

### The Juvenile Dependency Petition and Detention Hearing

A juvenile dependency petition (the Petition) was filed on October 24, 2011. The Petition alleged one count under section 300, subdivision (b) (failure to protect) and one count under section 300, subdivision (d) (sexual abuse). Under both counts, the Petition alleged: "On numerous unspecified dates, [A.L.] . . . was sexually abused by [F]ather . . . . The incidents of sexual abuse include, but are not limited to [F]ather fondling [A.L.]'s breasts and vagina, having [A.L.] fondle his penis, [F]ather orally copulating [A.L.], having [A.L.] orally copulate [F]ather, and inserting his penis into [A.L.]'s vagina, causing [A.L.] to suffer pain, fear, and humiliation."

At the detention hearing on October 25, 2011, Father's appointed counsel invoked Father's Fifth Amendment rights for all purposes, but represented that Father would talk to the social worker about visitation. On the basis of the detention report, the juvenile court ordered A.L. detained, but released her to Mother. The court ordered visitation with Father, up to once a week for one hour, with a therapist in a therapist's office. The court also issued a temporary restraining order against Father, requiring him to move out of the family home and to stay at least 100 yards away from A.L., her residence, and her school.

## IV.

### SSA's Jurisdiction/Disposition Report

The jurisdiction/disposition report, dated November 28, 2011, stated that social worker Jake Michel interviewed A.L. at school on November 17, 2011, during which Cecilia B. assisted A.L. on the iPad. A.L. typed "yes" when asked if she wanted to have a visit with Father and nodded her head "yes" when asked if she wanted someone present when she visits Father. She then typed, "dad is nice" and "yes" when asked if he is different now, and typed, "tyes" when asked if she had talked to Father. When asked if she wanted him to come home, she nodded "yes" and typed, "iw are A family" and "[I]

want dad jto come hhomee." When asked if she will feel safe if Father returned home, she typed, "idk." She again confirmed she had told Wilkerson the truth; however, she appeared to become upset, so Michel changed the subject.

On November 1, 2011, Mother informed Michel that she was looking for an attorney to file for divorce because "I believe my daughter." Mother reported that when, a few days earlier, A.L. had asked to visit Father, Mother replied, "I have to keep you safe," whereupon A.L. hugged Mother and (according to Mother) said, "[h]e ([F]ather) made me do things, which were her words."

According to the November 28 SSA Report, a face-to-face interview between Mother and Michel took place on November 17, 2011. In the interview, Mother told Michel that "[A.L.] is confused because she wants her father to come home, but she also recently informed her speech therapist that 'he ([F]ather) should be slapped' and '[t]his is her father, she loves her father.' Mother added that '[A.L.] knows everything about it was wrong.'" When asked if A.L. had had any contact with Father since she was detained, Mother replied, "[o]h, absolutely not."

Mother stated there had been a lack of sex and intimacy in her relationship with Father since A.L. was conceived. Mother acknowledged she knew that Father and A.L. showered together, that Father and A.L. saw each other naked, and that it was not appropriate for them to do so. Mother said that when she gives a shower to A.L., she never touches her body and she usually just gives her verbal directions. Mother considered it odd, once she thought about it, that A.L. needed two showers a day, and mentioned that she would come home and find Father washing sheets as if A.L. had wet her bed, which Mother said A.L. rarely does.

Although Mother told Michel that "[A.L.] is not someone who lies," she did not believe the sexual abuse allegations could be true and had no idea "where would she get these ideas." Mother then said that based on A.L.'s actions and reactions, she had no doubt that A.L. was sexually abused by Father, "[n]ot one single doubt." When

11

Mother was told there was no forensic evidence to support the sexual abuse allegations, she said, "[h]aving been molested as a child, it's so irrelevant."

## V.

### Father's Motion for an Expert Evaluation of
### A.L. and Her Facilitators

In March 2012, Father filed a motion, pursuant to Evidence Code section 730, for an order that A.L. and her facilitators participate in an expert evaluation conducted by Father's speech pathology expert. Father argued that research on facilitated communication suggested A.L.'s claims of sexual abuse might be false and statements attributed to A.L. "may be nothing more than writings by the facilitator."

In opposing the motion for an Evidence Code section 730 evaluation, Mother submitted research on facilitated communication and declarations by Cecilia B. and Agranowitz, both of whom stated they did not type for A.L., move her hand on the keyboard, finish her sentences, or influence her communications. The juvenile court denied the motion in April 2012 and, in May, denied Father's motion for reconsideration. Father's motion, Mother's opposition to it, and the court's ruling are explained in detail in part I.A. of the Discussion section.

## JURISDICTIONAL/DISPOSITIONAL HEARING

## I.

### The Juvenile Court Orders (1) Excluding A.L. as a
### Witness and (2) Denying Father's Motion to Exclude
### Hearsay Statements in SSA Reports

The jurisdictional/dispositional hearing was conducted over several days commencing on June 7, 2012. On the first day of the hearing, Father's counsel expressed his intent to call A.L. as a witness to testify. Referring to the typed communications

12

made on A.L.'s iPad, counsel argued: "[T]he burning question is whose communication is that? Is that the communication solely of the minor? Is it the communication solely of the facilitator adult, or is it a combination of the two?" The only way to answer those questions, counsel argued, would be to have A.L. testify in a setting and in a manner that would be least injurious to her.

On July 30, after hearing testimony from eight witnesses, whose testimony is described below, and receiving an offer of proof from Father, the juvenile court ruled that A.L. was unavailable as a witness. The court stated: "[R]equiring [A.L.]'s testimony would cause an unacceptable level of psychological stress and self-injurious behavior to the child. The possible benefit that would result from [A.L.]'s testimony would not justify the physical and emotional harm it would cause."

On June 13, 2012, Father filed a motion, pursuant to section 355, objecting to hearsay statements in the various SSA reports, specifically, to statements attributed to A.L. regarding alleged sexual abuse. He argued there was a dispute as to A.L.'s mental competency and educational level, and "the use of facilitated communication, under any circumstance, brings with it the potential for facilitator cuing or influence." The juvenile court denied the motion on July 26. Father's motion and the court's ruling are explained in detail in part II.A. of the Discussion section.

## II.

### Evidence at the Jurisdictional/Dispositional Hearing

At the jurisdictional/dispositional hearing, the juvenile court received in evidence the November 28 SSA Report and other SSA reports dated December 21, 2011, January 18, 2012, February 16, 2012, March 8, 2012, March 26, 2012, April 30, 2012, May 16, 2012, and June 7, 2012. The court heard testimony from (1) Michel, (2) speech and language pathologist Darlene Hanson, (3) psychologist Rodric Rhodes, Ph.D., (4) Mother, (5) Cecilia B., (6) Agranowitz, (7) Wilkerson, and (8) vice-principal Virginia Prado.

13

A.

*Witness Testimony*

1. *Michel*

Michel testified he had been assigned to the case in October 2011, following the detention hearing. He had met with A.L. 10 times, during about five of which she used an iPad to communicate.

With Cecilia B.'s assistance, Michel interviewed A.L. at her school on October 17, 2011. He did not interview her about the specifics of the allegations but asked her if the statements she made to Wilkerson were true. A.L. said they were true. Cecilia B. held the keyboard vertically in front of A.L., who typed with one finger. When A.L. responded to Michel's questions, Cecilia B.'s hands were not touching the keys of the keyboard and nobody was touching A.L.'s arm. Sometimes A.L. responded by typing a "Y" or nodding her head. She never used the words "mistress," "vagina," or "penis" during the interview. After about five minutes, A.L. got up to walk around for no more than two minutes.

On the same day as the interview at school, Michel interviewed A.L. at her home. During the interview, Mother held the keyboard in a manner similar to that used by Cecilia B., and A.L. typed with one finger. Michel did not recall that Mother held A.L.'s arm or hand. Mother assisted A.L. only by saying, "finish your thought." At times, A.L. would provide a response that was unintelligible or not recognized as a response; after being prompted to continue her thought, she would continue typing.

Michel testified he has monitored some of A.L.'s weekly monitored visits with Father. Michel has heard from the other monitors or from Mother by voice mail messages that the visits have been positive, although Mother told him that A.L. had diarrhea following two of the visits. One of those two visits was on the same date that Mother had had an automobile accident. A.L. has communicated to Michel that she wants to visit Father.

2. *Darlene Hanson*

Darlene Hanson testified she is a licensed speech and language pathologist and is a "trainer of facilitated communication." At the time of the hearing, she was employed by Whittier Area Parents' Association for the Developmentally Handicapped as director of communication services. Hanson met A.L. when she was eight or nine years old and became her primary therapist in 2009. Since 2011, Hanson has seen A.L. once every other week for one hour.

Hanson described "facilitated" communication as providing physical support to the person who is trying to communicate. She explained: "They generate their own ideas, but we give a resistance to their movement and rhythm. So I'm actually like a pulley pulling back." Hanson explained that some people with autism have difficulty with what is called the "proprioceptive system," which is "how we know where our body is in space." Physical support at the forearm or elbow is given in the form of resistance. "I'm actually like a pulley," Hanson explained, "I'm pushing up to the sky as a person pushes down to a display. . . . [A]s they do that, it tells their body where their arm is in space." As the person learns to gain more control of his or her body, the amount of resistance is decreased.

Hanson works with A.L. on her ability to communicate with an iPad. Although the iPad has a touch screen, which A.L. sometimes uses, she generally uses a wireless keyboard. She uses an application called "assistive chat," by which a device speaks out loud what she has typed. A.L. can communicate without the physical support, and, Hanson testified, "[w]hen she's typing I am not touching her hand that is typing or arm . . . that's typing." Hanson must hold the display board but does not have to touch A.L. Hanson places her hand on Amanda's back to provide "confidence and assurance."

A.L. needs a trained communication partner. A communication partner is not supposed to assist the person in finding the letter to type. A.L. is not always able to focus and communicate with Hanson. Sometimes, A.L. demonstrates stress by getting up

15

and pacing, and, if she is upset, her face turns red. Other times, if dealing with a stressful topic, A.L. puts her fist on her chin and she squeals. A.L. has also engaged in self-injurious behavior, such as pinching and slapping herself, and has tried to bite others.

Over an objection from Father's counsel, Hanson testified it would be stressful for A.L. to testify in a courtroom, but she could, perhaps, testify in a smaller space. In response to a question whether testifying would be harmful to A.L., Hanson testified that if A.L. is stressed, she could engage in self-injurious behavior and that problems could arise if four people were to ask A.L. questions. A better procedure would be for one person to ask her well-crafted questions in a neutral setting, with a neutral communicator working with her. Hanson believed, but was not confident, that A.L. could effectively communicate in the proper "structured setting" in which she would get to know the facilitator and other participants. However, if A.L. became emotional she would not be able to communicate, and it is not always possible to predict when A.L. is going to "act out."

Hanson described A.L. as having a "severe communication impairment" and as being "a non-verbal communicator." Using an iPad or letter board display, A.L. is "able to create language and engage in a conversation" and can "create sentences that are literate and intelligible." A.L. communicates at the conversational level, which means that she is able to generate complete sentences, make comments, ask questions, and initiate her own ideas.

Sometimes, A.L. has difficulty coming up with the word she is trying to express; in those situations, A.L. might "talk around it" or will describe a situation rather than use a particular word. Sometimes, A.L. types letters that do not form a word. In those situations, Hanson will tell A.L. to "back up and start over again." Other times, A.L. types letters that do form words, but the words do not make sense. In those situations, Hanson will tell A.L. to "keep going" and try to figure out what she is communicating, or will tell A.L. she will have to "say it again or a different way."

16

Hanson testified A.L. uses the same vocabulary as any student of her age, except at times she has a problem finding the right word. A.L. usually is not dependent on the facilitator to assist with spelling errors. Hanson is satisfied that A.L. has the appropriate motor control to effectively communicate with her, but emphasized that she cannot assume A.L. would be able to effectively communicate with everyone. A.L. has to know the facilitator and that the facilitator can effectively support her. Hanson does not believe A.L. is mentally retarded; however, Hanson does not know A.L.'s intellectual level.

3. *Rodric Rhodes, Ph.D.*

Rodric Rhodes, Ph.D., testified he is a licensed psychologist and licensed clinical social worker with subspecialties in autistic spectrum disorders and developmental disabilities. He has been providing psychotherapy services to A.L. since December 2011 and has had 21 sessions with her. His rapport with A.L. "started off good" and has improved over time. In the previous few sessions, A.L. began to talk about the allegations of sexual abuse.[4]

Mother attends the sessions with Dr. Rhodes and acts as A.L.'s prompter or communication facilitator. During the sessions, A.L. uses an iPad with voice output software and an external keyboard. She types with her index finger, and sometimes Dr. Rhodes asks her to repeat what she has typed. Dr. Rhodes testified that A.L. appears to be using her own volition to create letters on the keyboard; however, there were times when she typed letters after receiving verbal prompts to answer the question. Although A.L. does not require physical support at every session, Mother sometimes touches A.L.'s arm and provides what Dr. Rhodes called "facilitated support" to organize her body. Dr. Rhodes observes the physical interaction between A.L. and Mother "to make

---

[4] Dr. Rhodes did not review any of the SSA reports, some of which were given to him at the outset, because he did not want to be influenced by them or by any previous information related to the initial allegations and the investigations.

17

sure that [Mother] isn't moving the board around" and believes A.L.'s communications are "valid" and "not influenced or not manipulated by [M]other." He has had no concerns whether the communications coming from A.L. were her own words or thoughts.

According to Dr. Rhodes, A.L. communicates effectively at a relatively high level of expression of thought and feelings. She has had "behavioral outburst[s]" during sessions with him and has vocalized sounds and screams, become aggressive toward herself, and once tried to scratch and pinch him. On that occasion, A.L. remained so agitated that she was unable to complete the session.

When asked about A.L.'s motor control and communication skills, Dr. Rhodes testified: "I would say for the purpose of . . . communication, I believe . . . compared to other people [who] don't have autism, I would say she has impaired motor control. But I would say for her, it's over years of practice of communication. . . . [F]or her to be able to get her finger and her arm and her eyes focused and her body organized enough to point to the different letters and formulate the different words and thoughts . . . for the great majority of the time without any sort of physical prompting by [Mother], who's sitting next to her, that's very impressive for the people [whom] I work with [who] are on the autism spectrum and even within the sample of people who use these communication devices. [¶] It's much . . . rare[r] that someone's able to independently type without any physical prompting or physical support." Sometimes, A.L. will need "physical prompting to help either provide some resistance that can help her body to be more arranged in some fashion. . . . [I]t can be a stabilizing kind of organizing support that can help the person get their mind and their body more connected."

In Dr. Rhodes's opinion, testifying in court would be very stressful for A.L. and would not be in her psychological well-being. Dr. Rhodes testified: "[T]hat subject matter [(sexual abuse)] and this whole court process, I believe, is one of the sensitive, heightened potential for stress, reaction. It's one of the stressors." He believed A.L.

18

should not be involved in the court proceedings and his preference would be for A.L. to be as "far away from this process as possible." If required to testify, A.L. might engage in self-injurious behavior.

When informed of A.L.'s lengthy interview on October 18, 2011, Dr. Rhodes testified he did not believe A.L.'s ability to respond to questions regarding sexual abuse in that interview would lead to the conclusion that A.L. was comfortable in doing so. He testified: "I believe that there could be other interpretations of what's leading to her responding. It could be that she's comfortable with the topic. It could be that she's comfortable with the participants. It could be that she's keeping it altogether temporarily because of the judge ordering her to participate and knowing that she has to and then there could be subsequent acting out. . . . I wouldn't feel comfortable stating definitively that . . . she's comfortable."

If A.L. had to testify, Dr. Rhodes believed it would be best for her to do so in an office setting surrounded by familiar people. He testified: "[I]f she suspected that the questions were ones that, for whatever reason, [she] found anxiety-producing and she's required to answer a question that she found anxiety-producing, for whatever reason, I think it would be highly likely that she would become stressed and anxious. And then she would likely exhibit those kinds of behavior[] that we discussed earlier." Dr. Rhodes suggested that A.L. be prepared in advance for the questions and be questioned in a "not too aggressive manner." But even if an ideal environment in which to testify were created, it would be possible, and perhaps even likely, A.L. would not open up about the sexual abuse allegations if the facilitator was a stranger.

4. *Mother*

Mother testified that A.L. did not "display any episodes . . . that were out of the norm" immediately after the interview and physical examination on October 18, 2011. But, within a few days, A.L. had "a presence about her," indicating she was "exuding an emotion." Mother had a talk with A.L., who communicated that she was

19

upset and ashamed and "felt horrible." A.L. mentioned "the nasty things that [F]ather did to her and that [F]ather made her do." Within a half hour of the discussion, A.L. physically attacked herself and Mother. These outbursts recurred about twice a week. Sometimes following an outburst, A.L. was able to communicate the reason why she was upset. After one physical outburst, she said the reason was "Dad's not there anymore."

A.L. is aware of the court case and, in the previous week, had typed, "what is the judge going to make us do?" When Mother inadvertently said she would be in court the next day, A.L. became agitated and typed, "I'm afraid I'll be taken away from you." Mother told A.L. that she absolutely would not be taken away, everyone knows they are good for each other, and "we'll stay together." A.L. arose from the chair, slapped herself, and screamed. Then, she attacked Mother with her hands and her mouth open, at which point Mother demanded that A.L. go to her room. She came out of her room three times, still slapping, and, each time, Mother demanded that she go back to her room. When A.L. became quiet, Mother went into her room and saw her lying on her bed. Her shirt and blue jeans were covered in blood, her face was black and blue and swollen, her nose had been bleeding, and her lip had a large cut.

For Mother to be able to exercise control over A.L., her medication had to be increased. Before the dependency case, A.L.'s physical or emotional spikes were rare, i.e., once a month for about 30 to 40 minutes, with no physical attacks. Usually, her menses would cause her to react. Since the dependency case began, A.L.'s emotional spikes have been more frequent and more severe, she cannot be talked down to a calmer state, and she had bitten Mother two dozen times. "It had gotten so bad," Mother testified, "that I honestly did not know if I could continue to act in [A.L.]'s best interest and my best interest. . . . [S]he was beating me up every single week." A.L.'s behavior will spike in response to anything related to the court case and to interaction with Father; according to Mother, A.L. has "a huge fear of the court, and she has overwhelming shame about what happened."

20

Three weeks earlier, when the sexual abuse allegations were discussed in a session with Dr. Rhodes, A.L. reacted by hitting herself and attacking Dr. Rhodes and Mother. Dr. Rhodes was not able to calm A.L., so he and Mother had to leave the room. The only time A.L. behaved violently in therapy was when the subject of Father and the sexual abuse allegations were raised. Mother has been told that since the dependency case began, A.L. routinely acts up at school and often three adults are needed to hold her down and keep her safe. The need for restraint increased from twice in five months to about once every eight days, and A.L.'s bedwetting, once rare, has increased.

Mother is opposed to A.L. testifying. Mother testified: "I feel strongly along the lines of what Darlene Hanson had put forth. [A.L.] is very emotional. . . . She needs to have a comfort level in her surroundings as well as the person she has as a communicating partner. And, additionally, it's a topic which is emotionally difficult for her, actually, devastating." A.L. had expressed fear of coming to court and fear that "everyone would know what dad did to her." Mother could not state, however, "[a]s a solid hard fact" that A.L. would be harmed if she testified. A.L. visits Father once a week. She sometimes becomes agitated or wets her bed after a visit. Mother believed wetting the bed is a way for A.L. to lash out when she is angry at someone.

Mother has never had A.L. assessed to measure her intelligence quotient, does not know what her intelligence quotient is, and does not know the grade level or age at which she functions. Mother described A.L.'s vocabulary as "typical" and stated A.L. spells better than she does.

Mother described A.L. as a very honest girl. At first, Mother did not believe the allegations of the Petition; she did not believe the man whom she had known for over 20 years could have done such a thing. Her opinion has changed, and she is now convinced that Father violated A.L. Mother related a conversation in which A.L. asked when she could see Father, and Mother replied, "I need to keep you safe." A.L. said, "I know it's because of those nasty things he did to me and the nasty things he made me do

21

to him.  I feel horrible.  I feel ashamed.  I feel guilty."  A.L. made those communications using the iPad, while Mother provided physical support.

During a session in Dr. Rhodes's office sometime after the October 18, 2011 interview, A.L. communicated she knew that Dr. Rhodes and Mother wanted to talk about Father, but A.L. did not want to do so.  Mother asked A.L. why she was able to talk about Father with Wilkerson, whom A.L. did not even know, and A.L. replied, "because I wanted it to stop."  When A.L. asked Mother when they would be a whole family again, Mother told her, "we are a whole family" and if Father came back, "he would keep doing the same things to you."  A.L. said, "we're fine the way we are."

5. *Cecilia B.*

Cecilia B. testified she is employed with the Speech and Language Development Center, which helps children and adults learn how to better communicate.  At the Speech and Language Development Center, Cecilia B. works as an American Sign Language interpreter, assists students who use devices for communication, and teaches in the classroom.  She has worked in this field for 17 years and has been at the Speech and Language Development Center for seven years.

Cecilia B. testified she had worked with A.L. off and on for nine years, but had been working with her exclusively since just a few weeks before the October 14, 2011 disclosures.  Cecilia B. works with A.L. every Monday through Friday from 8:30 a.m. until 2:30 p.m., and assists her with schoolwork, language arts, social studies— "all the regular typical high school work that you do"—and also goes with her to student counsel, girls' group meetings, and speech therapy.  A.L. has a regular schedule of classes, much like any other high school student.  Cecilia B. did not know the level of A.L.'s reading and comprehension or A.L.'s intelligence quotient, but testified A.L. "excels" and described her as "brilliant," "smart," and "very bright."

Cecilia B. explained that A.L. communicates by typing on a keyboard connected to an iPad.  Cecilia B. physically assists A.L. in communicating by placing a

22

hand under A.L.'s elbow: "[T]he touch seems to help the connection to follow through with the thought." When Cecilia B. was asked if she physically assisted A.L. in "actually forming the letters on the keyboard," Cecilia B. testified: "No. No. We don't do anything like that. In fact, I follow her lead. When she's typing I follow her lead." Cecilia B. testified that, by using the described communication method, A.L. is able to type complete sentences, answers, and "details that I didn't even catch." Cecilia B. testified she has never physically typed a key on the keyboard and has never moved A.L.'s hand on the keyboard in order to help A.L. finish a thought.

Cecilia B. described what occurred on October 14, 2011, as follows: She took A.L. into the school restroom because A.L.'s bra was not on properly and her breast had become exposed. While she and A.L. were in the restroom, A.L. "lifted up her blouse and took—lifted up her bra, and she grabbed my hands, and she wanted me to touch her breasts." Cecilia B. told A.L., "that it wasn't appropriate, that no one should be touching her breasts except for her and she needed to do that in the privacy of her home." Upon returning to the classroom, Cecilia B. typed on the iPad what she had told A.L. in the restroom in order to reinforce the message. In response, A.L. typed, "my dad touches my boobs." When A.L. made this communication, Cecilia B. probably was supporting A.L.'s elbow, but did not assist her in identifying the letters or words.

Cecilia B. asked A.L. if Mother knew that Father touched her breasts. A.L.'s answer was vague, something to the effect of "she's around." To determine A.L.'s feelings, Cecilia B. also asked A.L. if she liked it, and A.L. responded, "yes."

Cecilia B. testified that A.L.'s disclosure was very upsetting, and "just the thought of having to deal with somebody that even allegedly was touched . . . frazzled my mind."

Cecilia B. was present at the interview on October 18, 2011, but her only participation was to explain to A.L. what was going to happen. Soon after Cecilia B. arrived at the interview, Agranowitz arrived to assist A.L. Cecilia B., though hearing

23

impaired, did hear Agranowitz say such things as, "I'm going to fix this," "can I just erase this because [it] kind of doesn't make sense to me," or "I'm going to erase that letter because I don't think it goes here." Cecilia B. explained the iPad is "highly sensitive" and could produce a series of letters by accident, so that when typing a word, "you may end up putting a couple 'r's' and 'x's' in this just by accident. And this was where all these corrections are coming from."

Although the interview lasted nearly three hours, A.L. tolerated it well. She did not resist, and, though appearing apprehensive, was not scared and did not act out. A.L. can become frustrated and react physically because she cannot speak; however, Cecilia B. did not observe A.L. become frustrated during the interview.

Cecilia B. described A.L. as "blatantly honest." Until October 14, A.L. had never disclosed "anything of this level of unusualness" and had never mentioned anything about trouble at home or with Father. But, once before, within the month that Cecilia B. became A.L.'s aide, there was a similar incident in which A.L. had exposed her breasts. A.L. had seen another student expose herself in a similar fashion, and Cecilia B. believed she is able to parrot the conduct of another person. Cecilia B. believed any teenager, including A.L., is capable of manipulating situations. Never before had Cecilia B. seen A.L. use the words "vagina" or "penis" on the iPad, and was surprised when she heard those words being attributed to her.

6. *Agranowitz*

Agranowitz testified she is a classroom teacher at the Speech and Language Development Center, where she works with students between the ages of 14 and 22, in the areas of employment, functional academics, and life and social skills. Her students have several different kinds of disabilities, including autism. She began working in speech and language in 1986, left the field to pursue other opportunities in 1995, returned to the field in 2005 as a transition specialist, and became a classroom teacher in 2006. She assists students with supported typing.

24

Agranowitz does not teach A.L. directly and does not have a close relationship with her. Prado asked her to assist A.L. in typing for the interview on October 18, 2011. Agranowitz testified she did not know the subject of the interview until she walked into the interview room. Agranowitz had assisted A.L. with communicating on three or four prior occasions for periods of 10 to 15 minutes or a little longer.

During the interview, A.L. typed directly on the face of the iPad rather than on an external keyboard. Agranowitz could not directly see the face of the iPad from where she was seated, but did look at it a couple of times. When A.L. was asked a question, she usually typed her response directly on the face of the iPad without assistance, and occasionally moved her elbow toward Agranowitz, who would touch A.L.'s elbow or back of the arm. Agranowitz demonstrated how she used her fingers with the palm face up under the bend in the elbow, or used a pinching motion with her index finger and thumb on top of the elbow. "[T]he technique is," Agranowitz testified, "basically, giving support away from the keyboard so when she makes the movement down, she goes purposely to a specific key that she wants to press." At times, Agranowitz placed her hand on A.L.'s shoulder and pressed down to give A.L. some sense of pressure.

During the interview, Agranowitz did not direct A.L.'s arm or finger to any particular letters. If A.L. typed something that did not make a complete comprehensible word, Agranowitz would say, "can you tell me better or can you type that again," and would direct A.L. to erase what she had typed. A few times, Agranowitz told A.L. she had misspelled a word, and, a couple of times, Agranowitz deleted a word. Agranowitz had seen A.L. make similar errors on prior occasions. When a misspelling or extra letter was typed, Agranowitz would direct A.L. to backspace and delete the extra letter. When A.L. stopped typing, Agranowitz would say, "is that what you wanted to say; finish your thought," as a form of encouragement. In one instance when Agranowitz told A.L. to

25

"finish your thought," Agranowitz said, "can I just erase this because [it] kind of doesn't make sense to me." In response, Wilkerson said, "if you know that she's made the—yeah. Go ahead and correct it."

Agranowitz testified she never touched the face of the iPad to type a letter and never suggested to A.L. how to answer a particular question or to use a particular word. Agranowitz testified, "I did not influence [A.L.]," "I did not type for [A.L.]," and "I wasn't making my own statements or adding letters to that pad." Agranowitz only provided support and did not control A.L.'s arm.

According to Agranowitz, the interview started around 2:00 p.m. and lasted roughly five hours. She did not recall that A.L. became frustrated or upset during the interview, that A.L. cried or hit herself, or that A.L. had to be restrained. A.L. stayed focused and her answers were related to the questions asked. Oddly, it seemed to Agranowitz, A.L. appeared to be happy and was smiling during the interview.

During her testimony, Agranowitz was handed a copy of a declaration she had signed on April 10, 2012, and was asked to look at it to refresh her recollection of its contents.[5] In the declaration, she had stated that at the time of the October 18, 2011 interview, she had no knowledge of A.L.'s original disclosure to Cecilia B. and no knowledge of the information to be elicited at the interview. Father's counsel asked Agranowitz whether before the interview on October 18, she had met with Prado, A.L., and a counselor to talk about whether Father had touched A.L. Agranowitz replied she had not; she did not recall talking to Prado directly or indirectly "about that stuff" and "[t]he truth is I don't remember any conversation on that particular day."[6]

_____

[5] Mother had submitted Agranowitz's declaration in opposition to Father's motion for an order that A.L. and her facilitators participate in an evaluation by Father's expert.

[6] At about this point in the proceedings, the juvenile court stated it had received and listened to audio recordings of A.L.'s interview on October 18, 2011, and of an interview of Cecilia B. and Prado. The court also stated it had "its own extensive notes as to what the court believes each contains."

26

Agranowitz acknowledged that, at some point in the interview, she said she was going to fix what A.L. had typed because "I know what she's saying." When asked how she knew what A.L. was saying, Agranowitz testified she meant to say she knew what A.L. was typing, not what she was saying. Agranowitz also acknowledged the audio recording of the interview reflected that she stated, "you want me to type this way." She did not know what she meant by that statement, maintained that she was not typing for A.L., and was convinced she did not "put those words in the i-Pad."

Agranowitz insisted she never changed the "context" of what A.L. had typed and had no personal interest in the case. Wilkerson did not tell Agranowitz to change anything A.L. had typed. Agranowitz acknowledged deleting some letters, but testified the deletions did not change the meaning of the communication.

7. *Wilkerson*

Wilkerson testified she is a licensed marriage and family therapist, has a master's degree in clinical psychology, and is employed by SSA as a senior social worker. She was assigned to A.L.'s case on October 18, 2011—the date of the interview.

Wilkerson made contact with A.L. at 1:00 or 2:00 p.m. on October 18. At the outset, only she, A.L., and Cecilia B. were present, while Prado was "in and out." At some point, an Orange County Sheriff's deputy arrived. At first, Wilkerson conducted the interview and Cecilia B. assisted A.L. in using the iPad. A.L., who was seated to Wilkerson's left, communicated by typing on the keyboard on the face of the iPad, which was propped up in front of A.L.

Wilkerson asked questions, which she described as "open-ended" and "non-leading," and A.L. responded by typing on the iPad. While A.L. typed, Cecilia B. provided physical support, mainly at A.L.'s shoulder and just below the armpit. A.L. "was having a lot of anxiety," and Wilkerson observed she had muscle tics, flapped her hands, and shook her head. Wilkerson testified: "Once I asked a question, she would—in between her muscle tics, she would take her finger—she had a pencil that she would

27

hold in the palm of her hand to help her keep the positioning and then take one finger and type one letter at a time."

Wilkerson took notes and read A.L.'s responses out loud. The interview lasted several hours, and audio recording started after about 45 minutes. Most of the words typed by A.L. made logical sense as responses to the questions asked.

About 10 minutes into the interview, Cecilia B. left and Agranowitz took her place in assisting A.L. Wilkerson testified Agranowitz supported A.L.'s arm in this way: "She held the child—she pulled the child's shirt up and bunched it up at the shoulder and just held the shirt to support the child's arm." Some of the words that A.L. typed were misspelled, and, on several occasions, Wilkerson asked A.L. to clarify what she had typed. "I'd ask her, what does that mean? Or I'd ask her the question in a different way to get a different response, and then she would give another answer."

Occasionally, A.L.'s finger would spasm or slip, and she would type the wrong letter. When that happened, Agranowitz would delete the letter. It did not appear to Wilkerson the answer was being modified. Wilkerson explained: "The child has issues controlling her muscles. And sometimes you would see her hand flicker, and she would accidently hit a key that she didn't mean to hit. So that word would be deleted. And she would be coached to finish her thought, and then she would either finish that sentence or just start a new sentence." It was obvious to Wilkerson when A.L. hit the wrong key, "based on her movements, on her response, on the structure of the sentence." A.L. might type four to six words before hitting the wrong key. A.L. was not directed to respond in any particular way, and Wilkerson did not believe that, by providing physical support, Agranowitz was influencing or modifying A.L.'s responses. Wilkerson believed that A.L. gave valid responses and was "on task."

Once Agranowitz replaced Cecilia B. in assisting A.L., Wilkerson wrote down A.L.'s responses, which were included verbatim in Wilkerson's report. Wilkerson

28

testified, in summary, A.L. disclosed that "[F]ather orally copulated her, had her orally copulate him and put his penis in her vagina."

Wilkerson recalled Agranowitz saying, "okay, I'm going to fix this; here, I know what she's saying," and recalled telling Agranowitz she could make the correction. In the middle of the interview, a sheriff's department investigator arrived and wrote some questions for Wilkerson to ask A.L.

Wilkerson was not informed of A.L.'s intelligence quotient, but knew A.L. "was functioning younger than her age but at the sixth or fifth—sixth or seventh grade level, something like that." Wilkerson did not recall a discussion on the topic whether A.L. had ever used words such as "penis" and "vagina." Wilkerson testified A.L. did type the word "mistress" on the iPad.

Wilkerson testified that no one else present during the interview typed a sentence, word, or letter on the iPad other than the "delete" key. Wilkerson indicated Agranowitz only touched the "delete" or "return" key or space bar, and did not recall if Cecilia B. had done so too.

8. *Virginia Prado*

Virginia Prado testified she is the vice-principal of high school transition at the Speech and Language Development Center, where she has worked for about 30 years. In September 2011, Prado assigned Cecilia B. to be A.L.'s one-on-one aide.

Prado first became aware of the allegations against Father when Cecilia B. came to her and asked her to look at some things A.L. had typed on the iPad. Cecilia B. did not describe the substance of the communications. After looking at the iPad, Prado asked Cecilia B. if the words could be erased because Prado did not want anyone else seeing them. Prado did not recall whether any sexual words were used or if words were erased at that time.

Prado took the iPad to her office, and there decided she needed to speak with A.L. At some point, before Prado spoke with A.L., Cecilia B. told Prado about the

incident in which A.L. exposed her breasts. Prado met with A.L., Agranowitz, and a counselor in Prado's office. Prado asked Agranowitz, rather than Cecilia B., to assist A.L. with communicating "[j]ust to make sure what [A.L.] was saying was real." During the meeting, Prado stated she had noticed A.L. was having a rough day and asked her open-ended questions, such as "[i]s there anything I can help you with." Prado did not ask A.L. questions about the statements made on the iPad and did not ask her a "sexual question," but did ask A.L. about possible sexual allegations against Father. Prado ended the meeting after about 15 minutes because A.L. got up and walked around, indicating she was ready to go back to class.

Prado testified she assumed the issue of sexual abuse was discussed in the meeting because "at that point is when we decided that we needed to report." After the meeting, Prado decided to let Cecilia B. make the decision whether to call SSA. Prado said to Cecilia B., "you know what you saw, and you know what your responsibilities are, so what is it that you need to do?"

According to Prado, A.L. had "meltdowns" on Monday, October 17, and Tuesday, October 18, 2011. When A.L. has a meltdown, "it's self-abusive where she's hitting herself in the face or the head or biting her forearms, hands." Prado was not present when Wilkerson and the sheriff's department investigators arrived at the school on October 18 to interview A.L. Prado did not recall being told why Agranowitz replaced Cecilia B. as A.L.'s facilitator during the October 18 interview.

Two sheriff's department investigators interviewed Prado and Cecilia B. on October 19, 2011. Prado recalled that during this interview, Cecilia B. related how A.L. disclosed that Father had touched her breasts.

Prado testified that sex education is not a part of A.L.'s school curriculum. Health class includes anatomy and the discussion of body parts, but the word "vagina" is not used.

30

*Exhibits*

In addition to the SSA reports, the juvenile court received in evidence all of Father's exhibits, which included a declaration of Agranowitz, a CD and transcript of the October 18, 2011 interview, and a CD and transcript of the interview of Prado and Cecilia B. by two sheriff's department investigators. The transcripts of the interviews were received in evidence with the understanding they might not be entirely accurate.

At one point during the hearing, the juvenile court stated it had listened to the audio recordings of the two interviews. As to the recording of A.L.'s interview on October 18, the court noted, "it was difficult for the court to hear some statements and some portions of the interview . . . . A few statements between persons were inaudible because the persons were whispering or too far from the microphone or because [A.L.]'s vocalization made it impossible to hear what the person or persons were saying."

## III.

## Juvenile Court's Ruling

On August 1, 2012, the juvenile court found allegations b-1 and d-1 of the Petition to be true by a preponderance of the evidence, and did not find the remaining allegations to be true.

The juvenile court made extensive findings on the record. With respect to activity before the October 18, 2011 interview, the court found that school personnel "acted and reacted to unusual circumstances in a manner that was the best that they could in those circumstances" and "did the best that they could." As for assisting A.L. with communicating through the iPad, the juvenile court stated: "The court finds it to be true that the school personnel who assisted [A.L.] with the use of the iPad during interviews with the social worker and law enforcement changed and/or deleted some letters and/or some words typed by [A.L.] on the iPad as responses to questions during those interviews. The court finds it to be true that some changes or deletions of the words or

31

letters during the interviews were made with [A.L.]'s agreement. Those instances are indicated in the recorded interviews wherein the social worker, Ms. Wilkerson, or the aid[e], Ms. Agranowitz, asked [A.L.] about making a change, a deletion, for example, 'do you want me to write the letter,' or 'what does the letter say? Finish your thought?' [¶] On other occasions it was clear that Ms. Wilkerson or Ms. Agranowitz asked [A.L.] about a correction or change by Ms. Wilkerson's or Ms. Agranowitz's tone of voice in the context of the conversation. In other situations, the letters or words typed by [A.L.] were changed or deleted by agreement between or among the social worker, school aid[e], and sheriff's investigators. [¶] The court finds it to be true that when the letters or words were changed or deleted by agreement of the social worker, aid[e], and sheriff's investigator[s], such changes or deletions were due to errors or problems in the spelling of a word due to reasons such as No. 1, [A.L.]'s muscle spasms or [tic]s, No. 2, [A.L.]'s finger 'sitting' on a key. And the court defines the phrase 'sitting on a key' as [A.L.]'s finger unintentionally holding down a key so long that multiples of the same letter or symbol were reproduced numerous times in a row; or No. 3, strain on the keyboard. And the court defines the term 'strain on the keyboard' as the unintentional touching of one or more keys near the target key so the keys in proximity to the target key were touched because of [A.L.]'s hand [tic]s or muscle spasms, making the words on the screen of the iPad unintelligible. [¶] The court finds it to be true that the school iPad aid[e] and other school personnel assisted the social worker and the sheriff's investigators with interpreting [A.L.]'s on-screen text. For example, the iPad aid[e] helped others understand when [A.L.] was asking a question versus making a statement and the meaning of abbreviations that [A.L.] used and so on. [¶] . . . [¶] The court finds it to be true that during the interview with . . . Wilkerson and law enforcement, [A.L.] signaled typing errors on some occasions by giving a look to or catching the eye of the iPad aid[e] or social worker. [A.L.] would also signal a problem with her typed response on occasion by stopping typing or by starting to type a new answer to the same question.

The court finds it to be true that when the school iPad aid[e] deleted a letter or letters and/or word or words, these deletions were minimal and did not affect the meaning of the responses given by [A.L.]."

The juvenile court declared A.L. to be a dependent of the court, ordered that legal and physical custody remain vested with Mother, and terminated dependent child proceedings with orders retaining general jurisdiction. The court ordered that Father have a one-hour monitored visit each week.

**DISCUSSION**

**I.**

**The Juvenile Court Did Not Err by Denying Father's
Motion to Have A.L. Evaluated by His Expert.**

A.

*Background*

In March 2012, Father filed a motion, pursuant to Evidence Code section 730,[7] for an order that "[A.L.] and her facilitators participate in a cognitive and fine motor skills evaluation" with Howard Shane, Ph.D., a speech pathologist and professor of communication science and disorders at Massachusetts General Hospital Institute of Health Professions. Father's motion attached two reports challenging the validity and reliability of facilitated communication as a means of allowing certain mentally disabled people to communicate. Father argued, "[t]he research on the validity of facilitated communication (FC) suggests that [A.L.]'s claims of sexual abuse may be

---

[7] Evidence Code section 730 states, in part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

33

entirely untrue, and that the statements attributed to [A.L.] through FC may be nothing more than writings by the facilitator." Father asserted A.L. is "severely disabled"; that before using facilitated communication, she "had no apparent ability to read, spell or type"; and her facilitators "provided cues or prompts that controlled the FC [(facilitated communication)] productions."

Father advised that Dr. Shane "would conduct a fine motor skills analysis, testing [A.L.]'s ability to identify and locate various letters and objects independent from her iPad" and would conduct double-blind testing of A.L. and the facilitator to "demonstrate who, in fact, authors the messages on the iPad." Dr. Shane would conduct this evaluation in any location where A.L. would be comfortable and suggested a neutral independent observer be present.

In opposition to the motion for an Evidence Code section 730 evaluation, Mother submitted research on facilitated communication and declarations of Cecilia B. and Agranowitz. In her declaration, Cecilia B. stated she did not direct, lead, or move A.L.'s hands in any direction on the keyboard; did not finish A.L.'s sentences; and did not type for A.L. In her declaration, Agranowitz explained the manner in which she assisted A.L., and stated: "I did not touch the iPad [A.L.] was using to type her information or responses to questions. I did not place my hands on her hands at any time to direct her to letters or in any particular direction on the keyboard. I did not personally type any information on the iPad. I did not influence [A.L.]'s responses on the iPad in any way." According to Agranowitz, "[A.L.] was able to type on her own that her father had touched her breasts and vagina."

Mother also submitted a letter from Hanson, explaining that, although A.L. learned to type her thoughts by using facilitated communication, "at this time she does not require the physical support of touch with some of her support persons." Hanson explained how A.L. communicates with the keyboard and questioned whether her communications would even be considered facilitated. Hanson expressed concern

34

whether A.L., in light of her anxiety and emotional state, would be able to participate in an evaluation by Dr. Shane and whether she would be able to "demonstrate her ability with an unfamiliar person in a 90-minute to two-hour session."

In reply, Father asserted that it was unnecessary to present concrete evidence the facilitators cued or influenced A.L.'s communications because the facilitators themselves might have been unaware of their influence on A.L. For the same reason, Father argued, the declarations by the facilitators that they did not influence A.L. constituted evidence supporting the need to have A.L.'s cognitive abilities independently evaluated. Father argued too, "there is no evidence that there would be any distress or risk of emotional or physical harm to [A.L.] by participating in the proposed examination."

Father submitted a position statement on facilitated communication from the American Speech-Language-Hearing Association, taking this position: "[T]he scientific validity and reliability of facilitated communication have not been demonstrated to date. Information obtained through or based on facilitated communication should not form the sole basis for making any diagnostic or treatment decisions." (Am. Speech-Language-Hearing Assn., Position Statement, Facilitated Communication, *supra*, <http://www.asha.org/docs/html/ps1995-00089.html> [as of July 29, 2013].) The position statement advised: "When information available to facilitators is controlled and objective evaluation methods are used, peer-reviewed studies and clinical assessments find no conclusive evidence that facilitated messages can be reliably attributed to people with disabilities. Rather, most messages originate with the facilitator." (*Ibid.*)

After hearing argument of counsel, the juvenile court denied Father's motion and stated on the record the reasons for its decision. The court distinguished authority cited by Father on the ground he already had an expert and was not asking for the court to appoint him one. The court found that, "given [A.L.]'s disability, the

35

evidence now before the court shows that such an examination would be detrimental to her safety and well-being."

Father filed a motion for reconsideration that attached an article written by a former facilitator who had assisted an autistic child in a high-profile sexual abuse case. (Boynton, *Facilitated Communication—what harm it can do:  Confessions of a former facilitator* (2012) Evidence-Based Communication Assessment and Intervention.)  When it was shown the autistic child's allegations of sexual abuse were false, and were, in fact, the communications of the facilitator, the author renounced facilitated communication and concluded it was not valid.  (*Ibid.*)  The juvenile court denied Father's motion for reconsideration, reasoning the article was the author's personal opinion, not a scientifically based, peer-reviewed study.

On the first day of the jurisdictional/dispositional hearing, Father asked the court to look at the article and reconsider his motion for an order to have A.L. and her facilitators evaluated by Dr. Shane.  The juvenile court denied the request.  On August 1, 2012, Father again asked the court to reconsider his motion.  The court again denied the request.  The court stated:  "The court does find that an evaluation of the child, as required by father, would be detrimental to [A.L.] for the same reasons as described for the denial of [A.L.]'s being a witness in this case."

B.

*Relevant Law and Standard of Review*

In his appellant's reply brief, Father states he "does not now rely on Evidence Code section 730 as a basis for permitting Dr. Shane to examine [A.L.]" and he "has already conceded that section 730 was not the appropriate vehicle by which to obtain the juvenile court's approval of an examination of [A.L.]."  Instead, Father asserts the motion should have been granted under the juvenile court's inherent power to order discovery.

36

Father cites *In re Dolly A.* (1986) 177 Cal.App.3d 195 (*Dolly A.*) to support his argument the juvenile court had inherent power to order an evaluation of A.L. by Dr. Shane. In *Dolly A.,* the court did state the "[j]uvenile courts, like all other courts, possess inherent power to order discovery." (*Id.* at p. 203.) But, *Dolly A.* held that Penal Code section 1112, which prohibits trial courts from ordering the psychiatric evaluations of sexual assault victims for credibility determinations, prohibited the trial court from ordering a psychiatric evaluation of the child, who had claimed she was the victim of child abuse by her father. (*Dolly A.*, *supra*, at pp. 197-198, 201, 203.) The court reasoned Penal Code section 1112 applied to the juvenile dependency proceeding because it was more criminal than civil. (*Dolly A.*, *supra*, at p. 203.)

We will assume, without deciding, the juvenile court in this case had the inherent power to order an evaluation of A.L. and her facilitators by Dr. Shane. As Father recognizes, the order denying Father's motion is reviewed under the abuse of discretion standard. (*Joe Z. v. Superior Court* (1970) 3 Cal.3d 797, 804-805 [juvenile court has discretion to permit discovery in delinquency cases]; *Dolly A.*, *supra*, 177 Cal.App.3d at p. 204 [juvenile court's discovery orders reviewed under abuse of discretion standard]; *Collins v. Superior Court* (1977) 74 Cal.App.3d 47, 52 [juvenile court's order denying appointment of expert under Evidence Code section 730 reviewed for abuse of discretion].)

""""The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."""" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) A trial court exceeds the bounds of reason when, in light of the evidence and the applicable law, the court's decision was not a permissible option. "The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria. 'The scope of discretion

37

always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.'" (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831.)

C.

*Substantial Evidence Supported the Juvenile Court's*
*Denial of Father's Motion.*

The juvenile court did not abuse its discretion by denying Father's motion for an order that A.L. and her facilitators be evaluated by Dr. Shane. The premise of Father's motion was that facilitated communication was an invalid means of communication and was inherently unreliable. To determine whether the communications typed on the iPad were those of A.L. or her facilitators, Father asserted, it was necessary to determine A.L.'s cognitive abilities and ability to communicate without facilitation, and to determine the degree, if any, to which the facilitators influenced A.L.'s thoughts.

We recognize the debate over the validity and reliability of facilitated communication and take no side in it. The juvenile court was presented with reports, studies, and evidence on both sides of the debate, which were sufficient for the court to understand facilitated communication and make a reasoned decision as to its use and reliability in regards to A.L.

Substantial evidence supported a finding, express or implied, that whatever the validity of facilitated communication in general, the communications on the iPad were those of A.L., not her facilitators. In their declarations submitted in opposition to Father's motion, both Cecilia B. and Agranowitz stated they did not direct, lead, or move A.L.'s hands in any direction on the keyboard and did not type for A.L. In her letter submitted in opposition to Father's motion, Hanson also described the manner in which

38

A.L. is assisted in communicating and questioned whether A.L.'s communications would even be considered facilitated.

Both Cecilia B. and Agranowitz testified at great length about how they facilitated and supported A.L. and both confirmed they did not move her hand or type for her. Cecilia B. testified that she has never herself typed a key on the keyboard or moved A.L.'s hand in a particular direction to help A.L. finish a thought. Agranowitz testified she never touched the face of the iPad to type a letter, never suggested to A.L. how to answer a particular question or to use a particular word, "did not influence [A.L.]," did not type for her, and "I wasn't making my own statements or adding letters to that pad."

Michel testified that when he interviewed A.L., she typed with one finger, Cecilia B.'s hands were not touching the keys of the keyboard, and nobody was touching A.L.'s arms. Dr. Rhodes testified he observed the interactions between A.L. and Mother, and believed A.L.'s communications are "valid" and were "not influenced or not manipulated by [M]other." He had no concerns whether the communications coming from A.L. were her own words or thoughts. Wilkerson, who conducted the October 18, 2011 interview of A.L., testified that although she had muscle control issues, she did her own typing on the iPad and was not directed by Agranowitz or Cecilia B. to respond in a particular way.

The juvenile court heard the audio recording of the October 18, 2011 interview and had access to the transcript of it. The court could hear for itself whether or to what extent A.L. was orally cued or prompted by her facilitators during that interview.

Substantial evidence also supported a finding, express or implied, that A.L. had the cognitive ability to understand the questions asked and respond coherently to them. Father argues, at several points, that A.L. has never undergone an intelligence test and has never had her intelligence quotient determined. While that is true, and A.L.'s precise level of cognitive skills is unknown, witness testimony established that A.L. is bright, honest, studies at a sixth to seventh grade level, and can communicate coherently.

39

Dr. Rhodes testified A.L. communicates effectively at a relatively high level of expression and thought. Mother testified A.L. has a vocabulary that was "typical" and that she was a very honest girl. Hanson testified A.L. has a "severe communication impairment" but can "create language and engage in a conversation," can "create sentences that are literate and intelligible," and uses the same vocabulary of any student her age.

Cecilia B. testified she assists A.L. with her schoolwork, which includes "all the regular typical high school work." Cecilia B. testified A.L. "excels" and described her as "smart," "very bright," and "blatantly honest." Wilkerson, though not informed of A.L.'s intelligence quotient, knew A.L. "was functioning younger than her age but at the sixth or fifth—sixth or seventh grade level, something like that." No witness testified A.L. was mentally retarded. Both Mother and Father believed A.L. was bright and honest.

Finally, substantial evidence supported the juvenile court's finding that ordering A.L. to be evaluated by Dr. Shane would have been detrimental to her safety and well-being. Hanson stated in her letter submitted in opposition to Father's motion: "[A.L.]'s ability to communicate is greatly impacted by her emotions. She is typically in an anxious state, and easily becomes more anxious in new situations, when she is not understood, or when she is uncomfortable in general. Her anxiety is presented by quick fast pacing, head rocking, teeth grinding, wringing of her hands, she becomes red in the face, and screeching. When very upset her behavior[] can become self-abusive or she will attack a familiar person. I am not sure if she would go after a stranger. My concern would be that given this amount of time and the context[, A.L.] might be anxious. I would expect her to be aware of the situation and the purpose of her meeting. It would be questionable as to w[he]ther or not [A.L.] would be able to actively participate in an assessment and demonstrate her ability with an unfamiliar person in a 90-minute to two-hour session." Hanson, Dr. Rhodes, and Mother testified that testifying at the

40

hearing would be harmful to A.L., and Dr. Rhodes went so far as to say that A.L. should be as far away from the dependency proceedings as possible.

After listening to the audio recording of the October 18, 2011 interview, the juvenile court commented that despite the comfortable setting and presence of persons known to A.L., "one can hear [A.L.]'s stress level rise during questions about the specific allegations of molestation and sexual assault. Her vocalization increase[d] in volume and intensity." The court also noted: "[A.L.] indicated that she was embarrassed and suffered discomfort, as she disclosed the allegations during the interviews. Her discomfort and embarrassment w[ere] also obvious as . . . the court listened to the audio recordings of the interview. Her vocalizations at times increased in volume, and the tone or nature of her vocalizations became more intense at times. . . . [¶] . . . [I]t appeared to be difficult for [A.L.] to discuss the allegations. And she did relate that she was embarrassed and uncomfortable in discussing them."

Father argues he was unable to present his case without the requested evaluation of A.L. and her facilitators. We disagree. Father had full ability to cross-examine witnesses, including A.L.'s facilitators, and nothing stopped him from presenting his own witnesses, including Dr. Shane. Father argues Dr. Shane's testimony, without an evaluation of A.L., "would likely have had no bearing on the issues in this case." But from the record, we cannot tell what influence Dr. Shane's testimony might have had at the jurisdictional hearing because Father declined to call Dr. Shane as a witness.

In light of the evidence supporting findings that (1) the communications on the iPad were A.L.'s, not the facilitators', (2) A.L. had the intellectual and cognitive ability to understand the questions asked and respond coherently to them, and (3) an evaluation by Dr. Shane would be detrimental to A.L.'s safety and well-being, denial of Father's motion was within the juvenile court's "permissible range of options set by the

41

legal criteria." (*Department of Parks & Recreation v. State Personnel Bd.*, *supra*, 233 Cal.App.3d at p. 831.)  The court, therefore, did not abuse its discretion in so doing.

## II.

### The Juvenile Court Did Not Err by Denying Father's Motion to Exclude Hearsay Statements, Attributed to A.L., Appearing in SSA Reports.

### A.

*Background and Relevant Law*

Father argues the juvenile court abused its discretion by denying his motion, made pursuant to section 355, objecting to hearsay statements in the various SSA reports regarding alleged sexual abuse attributed to A.L.  In his motion, Father argued the statements were not admissible under the child hearsay or child dependency exceptions and could not be relied upon as the basis for jurisdiction unless A.L. were subject to cross-examination.  The juvenile court denied the motion and overruled the objections after making extensive findings on indicia of reliability and corroboration.

Pursuant to section 355, subdivision (b), social services agency reports and hearsay statements contained within them are admissible and constitute competent evidence to find dependency jurisdiction.  However, section 355, subdivision (c)(1) provides, "[i]f any party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions . . . ."  As relevant here, those exceptions are:  "[t]he hearsay evidence would be admissible in any civil or criminal proceeding under any statutory or decisional exception to the prohibition against hearsay" and "[t]he hearsay declarant is available for cross-examination."  (§ 355, subd. (c)(1)(A) & (D).)

42

The child dependency exception to the hearsay rule is a decisional exception within the meaning of section 355, subdivision (c)(1)(A). "The difficulties of proving child sexual abuse in juvenile dependency cases led our Supreme Court in *In re Cindy L.* (1997) 17 Cal.4th 15 . . . (*Cindy L.*) to establish the child dependency hearsay exception for a child victim's out-of-court statements in dependency hearings. Under this exception, child hearsay statements in dependency proceedings in which sexual abuse is alleged are admissible if (1) the court finds that the time, content and circumstances of the statements provide sufficient indicia of reliability; (2) the child is available for cross-examination or there is evidence of child sexual abuse that corroborates the child's statements; and (3) interested parties have adequate notice that the statements will be used. [Citation.]" (*In re April C.* (2005) 131 Cal.App.4th 599, 608-609.)

"Following the Supreme Court's articulation of the child dependency exception in *Cindy L.*, section 355 was amended to expressly authorize the admission of hearsay statements of a child victim contained in a social study. Subsequent to the enactment of section 355, our Supreme Court again considered the issue of the child dependency exception in *In re Lucero L.* (2000) 22 Cal.4th 1227 . . . (*Lucero L.*). Noting that pursuant to section 355, subdivision (b), a hearsay statement in a social study was admissible even if it did not meet the requirements of the child dependency exception and even if the minor were incompetent to testify, unless such a statement was the product of fraud, deceit, or undue influence (*Lucero L.*, *supra*, at pp. 1242-1243), the court recognized that due process required a finding by the court that '"the statement bears special indicia of reliability."' [Citation.]" (*In re April C.*, *supra*, 131 Cal.App.4th at pp. 609-610, fns. omitted.)

We review for abuse of discretion the juvenile court's conclusion that hearsay statements are admissible under the child dependency exception. (*In re Cindy L.* (1997) 17 Cal.4th 15, 35 (*Cindy L.*) As we shall explain, the juvenile court made all three findings necessary to deny Father's motion to exclude hearsay statements in the SSA

43

reports.  Those findings were supported by substantial evidence and were legally sufficient under section 355, subdivision (c).  The juvenile court, therefore, did not abuse its discretion.

B.

*The Juvenile Court's Findings Were Supported by Substantial Evidence and Were Legally Sufficient to Support the Child Dependency Exception.*

### 1.  *Indicia of Reliability*

To establish the child dependency exception, the juvenile court first must find, "the time, content and circumstances of the statement provide sufficient indicia of reliability."  (*Cindy L.*, *supra*, 17 Cal.4th at p. 29.)  Indicia of reliability include "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate." (*Id.* at pp. 29-30.)

On the issue of reliability, the juvenile court found (1) A.L. had no motive to lie or fabricate the truth; (2) there was no evidence that A.L. did not love Father, was angry at him, or was retaliating against him; (3) both Father and Mother believed A.L. was honest; (4) the disclosures were "serial," i.e., A.L. initially made a partial disclosure and made fuller disclosures in subsequent interviews; and (5) A.L. was embarrassed and uncomfortable in making the disclosures, and "it appeared to be difficult for [A.L.] to discuss the allegations."

Substantial evidence supported the juvenile court's findings on reliability. Father does not contend otherwise; instead, he argues that "because the dispositive issue is whether [A.L.] herself scribed the words upon which the allegations were based, the writings themselves simply cannot be deemed reliable."  We concluded above that the evidence before the juvenile court supported findings that the communications on the iPad were A.L.'s, not the facilitators', and that A.L. had the cognitive ability to

44

understand the questions asked and respond coherently to them. In other words, the evidence showed that A.L. was the source of, and did type, the communications on which the allegations were based. The indicia of reliability, found by the juvenile court, confirmed the authenticity of the communications on the iPad and supported the admissibility of the hearsay statements contained in the SSA reports.

Father contends A.L.'s statements were unreliable because A.L. used words, such as "mistress," "penis," and "vagina," that would not be expected of a child of her age. We cannot say for certain whether such words would be expected in the vocabulary of a 16-year-old girl. However, unexpected terminology is only one indicia of reliability, and evidence of the other indicia supported the juvenile court's finding that A.L.'s statements were reliable.

2. *Corroboration*

To establish the child dependency exception, the juvenile court must also find, "a child must either be available for cross-examination or there must be evidence of child sexual abuse that corroborates the statements made by the child." (*Cindy L.*, *supra*, 17 Cal.4th at p. 29.) As corroboration of A.L.'s statements, the juvenile court found: "[F]ather took showers in the nude with his daughter, who was also unclothed at the same time. [¶] Sheriff's investigators examined the shower stall in which [F]ather and [A.L.] showered together. The shower stall was apparently quite small, necessarily causing the father and daughter to come into contact—to have to come into contact with each other's bodies while showering." Father acknowledges the truth of the corroborating evidence, and acknowledges that showering naked with A.L. might have been inappropriate. He contends, however, that evidence is insufficient to corroborate A.L.'s statements.

For purposes of the child dependency exception, corroborative evidence is evidence that would support a logical and reasonable inference that the act of sexual abuse described in the hearsay statement is true. (*Cindy L.*, *supra*, 17 Cal.4th at p. 35.) In *In re B.D.* (2007) 156 Cal.App.4th 975, 984, the court concluded the quantum of

45

corroborative evidence necessary to support a jurisdictional finding after a section 355, subdivision (c)(1) objection has been made is the same as that necessary under criminal law to corroborate accomplice testimony. To corroborate accomplice testimony, the corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, so long as it tends to implicate the defendant by relating to an act that is an element of the crime. (*People v. Davis* (2005) 36 Cal.4th 510, 543 (*Davis*); *People v. McDermott* (2002) 28 Cal.4th 946, 986.) The independent evidence need not corroborate the accomplice as to every fact to which the accomplice testifies (*Davis*, *supra*, at p. 543) and need not establish every element of the charged offense (*People v. McDermott*, *supra*, at p. 986). The corroborating evidence is sufficient if, without aid from accomplice testimony, it """"tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.""" (*Davis*, *supra*, at p. 543; see *People v. Williams* (1997) 16 Cal.4th 635, 680-681.)

Among other things, A.L. communicated that Father touched her breasts and private parts. Evidence that Father showered in the nude with A.L. and washed her in a small shower space where their bodies would touch supports a logical and reasonable inference such statements were true. Mother had commented she found it odd that A.L. sometimes needed two showers a day. A grown man showering in the nude with his 16-year-old daughter in a small shower space, even if not sexual, is such a bizarre practice that, standing alone, it deserves consideration. Evidence of this practice tends to connect Father with the allegations of sexual abuse in such a way as to reasonably justify the conclusion that A.L. was telling the truth.

3. *Adequate Notice*

Finally, to establish the child dependency exception, the juvenile court must find that interested parties have adequate notice that the statements will be used. (*Cindy L.*, *supra*, 17 Cal.4th at p. 29.) As the juvenile court noted, all parties agreed they

had received adequate notice that the hearsay statements attributed to A.L. would be used at the jurisdictional/dispositional hearing.

## III.

### The Juvenile Court Did Not Err by Finding A.L. Was Unavailable to Testify.

#### A.

*Background*

At the outset of the jurisdictional/dispositional hearing, Father requested that A.L. testify. His counsel asserted due process required that Father have the right to question his accuser and, "absent [A.L.] being questioned by counsel, I do not believe that my client is going to receive due process." The court announced it would issue a ruling the next week.

At the juvenile court's invitation, Father filed an offer of proof asserting (1) Father has a constitutional right to call A.L. as a witness; (2) there is a genuine issue as to A.L.'s competence; (3) there is a genuine issue as to the veracity of the sexual abuse claims; (4) there is a genuine issue as to A.L.'s custody; and (5) there is a genuine issue as to the authorship of the claims of sexual abuse. Father argued no witness had been able to testify as to A.L.'s intelligence quotient; A.L. had used words that were beyond her intellectual or educational capacity; A.L.'s testimony was necessary to substantiate or refute statements in the jurisdictional/dispositional report; A.L.'s testimony was highly relevant to the truthfulness of the claims; "[i]t is critical and necessary for [A.L.] to testify to resolve the issue as to whether the assistance provided to [A.L.] results in the information being obtained is solely attributable to [A.L.], and not to the facilitator/assistant"; and there was no "conclusive testimony" that testifying would be harmful to A.L.[8]

---

[8] Father also claimed that A.L. and Mother had recanted. He provided no evidence to support that claim and does not raise it on appeal.

47

After hearing the testimony of all the witnesses, and receiving Father's offer of proof, the juvenile court found that A.L. was unavailable to testify. The court's explanation of its ruling, made in detail and at length, spans 13 pages of the reporter's transcript. Relying on Evidence Code section 240 and *In re Jennifer J.* (1992) 8 Cal.App.4th 1080 (*Jennifer J.*), the court stated in conclusion: "[T]he court finds that [A.L.] is unavailable as a witness pursuant to Evidence Code section 240 because she is unable to testify at the hearing because of a presently existing physical [condition] and because of a presently existing mental impairment. [¶] In addition, the court also finds that based on the evidence and based on the child's best interest and after weighing the rights of all parties, the court finds that requiring [A.L.]'s testimony would cause an unacceptable level of psychological stress and self-injurious behavior to the child. The possible benefit that would result from [A.L.]'s testimony would not justify the physical and emotional harm it would cause."

B.

*A.L. Was Unavailable to Testify Under*
*Evidence Code Section 240.*

Under Evidence Code section 240, subdivision (a)(3), "'unavailable as a witness'" means the declarant is "unable to attend or to testify at the hearing because of then-existing physical or mental illness."

We review a trial court's determination of unavailability under Evidence Code section 240, subdivision (c)(3) under a de novo standard. In *People v. Winslow* (2004) 123 Cal.App.4th 464, 471, the court held a de novo standard of review is applicable because the determination of unavailability is a mixed question of fact and law. Following *People v. Winslow*, the court in *People v. Mays* concluded: "[T]he determination whether a witness is unavailable to testify at trial due to mental illness or infirmity that would cause substantial trauma, is a mixed question of law and fact, with factual findings subject to a deferential standard of substantial evidence, and findings of

48

law subject to independent review." (*People v. Mays* (2009) 174 Cal.App.4th 156, 172.) In *People v. Mays*, the court concluded a de novo standard of review is applied to those findings when the trial court's decision "implicates the constitutional right to confront a witness at trial." (*Ibid.*)

In dependency proceedings, the right to confront witnesses is guaranteed by due process. (*In re Malinda S.* (1990) 51 Cal.3d 368, 383, fn. 16; *In re S.C.* (2006) 138 Cal.App.4th 396, 424.) Accordingly, we will assume a de novo standard applies to the juvenile court's decision that A.L. was unavailable under Evidence Code section 240, subdivision (a)(3).

Under Evidence Code section 240, subdivision (a)(3), "[t]o excuse the witness from live testimony, the infirmity must be sufficiently problematic that it makes live testimony at trial '"relatively impossible,"' not merely inconvenient. [Citation.] 'Relatively impossible' includes 'the relative impossibility of eliciting testimony without risk of inflicting substantial trauma on the witness.'" (*People v. Mays*, *supra*, 174 Cal.App.4th at p. 172.) "In other words, where substantial trauma would ensue from the declarant testifying, it is 'relatively impossible' for him or her to testify, and thus, the declarant is unavailable as a witness based on 'mental illness or infirmity.'" (*People v. Winslow*, *supra*, 123 Cal.App.4th at p. 472.)

The juvenile court found that A.L. was unavailable as a witness, pursuant to Evidence Code section 240, subdivision (a)(3) because of a presently existing physical condition and a presently existing mental impairment. It cannot be disputed that A.L., who is autistic and cannot speak, has such physical and mental impairments. The juvenile court recited in detail A.L.'s physical and mental impairments resulting from autism, explained at length why those impairments rendered A.L. unable to testify, and explained why A.L. likely would suffer mental and emotional trauma if required to testify. The juvenile court cited the testimony of Dr. Rhodes, who testified A.L. should not be involved in the trial at all and who related incidents in which A.L. injured herself

and became physically aggressive to others while discussing the sexual abuse allegations. The court also cited the testimony of Mother, who testified that A.L. engaged in self-injurious behavior and attacked Mother after learning Mother was going to be in court. Mother testified A.L. has "a huge fear of the court" and becomes agitated in response to anything related to court and to interaction with Father. Both Mother and Hanson believed that testifying would be harmful to A.L. and both were opposed to her doing so.

Father argues that testifying at trial, at most, would be inconvenient for A.L. and points to evidence that she endured the October 18, 2011 interview without incident. Arrangements could be made, Father argues, to have A.L. testify in a more comfortable and less threatening place than a courtroom.

The juvenile court listened to the audio recording of the October 18 interview and, in finding A.L. was unavailable to testify, found: "During her recorded interview on October 18, 2011, one can hear [A.L.]'s stress level rise during questions about the specific allegations of molestation and sexual assault. Her vocalization increase[d] in volume and intensity even though the interview occurred at her school, a place known to her and comfortable for her. She's being interviewed by persons who are trained professionals and some of whom are known to her from her school. There is also a personable social worker who has had prior experience with autistic children . . . and two sheriff investigators . . . who presumably have special training in sexual assault crimes . . . . [¶] . . . [¶] . . . Despite all of these safeguards for her comfort and well-being, [A.L.] still decompensated after the interviews."

Substantial evidence supported the juvenile court's findings that A.L. had an existing physical or mental illness and that A.L. would suffer substantial trauma if required to testify. Based on those findings, and exercising de novo review, we conclude it would have been relatively impossible for A.L. to testify due to the relative impossibility of eliciting testimony without the risk of inflicting substantial trauma on

50

her.  A.L. was, therefore, unavailable as a witness under Evidence Code section 240, subdivision (a)(3).

Because we conclude A.L. was unavailable as a witness under Evidence Code section 240, subdivision (a)(3), we do not address whether she was unavailable under *Jennifer J.*, *supra*, 8 Cal.App.4th 1080.[9]

## DISPOSITION

The jurisdictional/dispositional orders are affirmed.


FYBEL, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


ARONSON, J.

---

[9]  In *Jennifer J.*, *supra*, 8 Cal.App.4th at page 1089, the Court of Appeal concluded the juvenile court has discretion, notwithstanding Evidence Code section 240, to find a child is unavailable as a witness under certain circumstances.  The court explained:  "[T]he juvenile court judge in a proper case may refuse to require the attendance and testimony of the child who is the subject of the litigation. . . . Where . . . the child's desires and wishes can be directly presented without live testimony, where the issues to be resolved would not be materially affected by the child's testimony, and where it is shown that the child would be psychologically damaged by being required to testify, we hold the juvenile court judge has the power to exclude such testimony." (*Jennifer J.*, *supra*, at p. 1089.)